## STALLO v. WAGNER.

(District Court, S. D. New York. November 17, 1914.)

### No. 11–138.

1. BANKS AND BANKING ☞287—NATIONAL· BANKS—RECEIVERS—ACTIONS ON CLAIMS—EVIDENCE.

In a suit by a depositor to charge the receiver of a national bank with the proceeds of certain notes and drafts delivered to it by complainant, evidence *held* to show that the instruments were given for the accommodation of the president of the bank, so that the amounts were not proper charges against the bank, but against the president individually.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 1089–1104, 1126, 1127; Dec. Dig. ☞287.]

2. BANKS AND BANKING ☞287—NATIONAL BANKS—RECEIVERS—ACTIONS ON CLAIMS—EVIDENCE.

In a suit by a depositor in an insolvent national bank to charge the receiver with amounts transferred by the president of the bank from complainant's account to other accounts, evidence *held* to show that the transfers so made were authorized by the depositor, notwithstanding his denial.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 1089–1104, 1126, 1127; Dec. Dig. ☞287.]

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. BANKS AND BANKING ⊚⇒287—NATIONAL BANKS—RECEIVERS—ACTIONS ON CLAIMS—EVIDENCE.

Evidence *held* insufficient to charge the receiver of an insolvent national bank with the proceeds of the sale of certain bonds, which complainant delivered to the president of the bank, taking his individual receipt therefor.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 1089–1104, 1126, 1127; Dec. Dig. ⊚⇒287.]

4. BANKS AND BANKING ⊚⇒262—ACTS OF PRESIDENT—AGENCY.

Where a national bank depositor gave the president of the bank bonds to be sold and the proceeds deposited, and also checks for the amount to be realized from the sale, which were to be applied by the president to certain payments, the president was the agent of the depositor, and not of the bank, in making the application of the proceeds, and the bank is not liable for a misapplication thereof.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 1001–1006; Dec. Dig. ⊚⇒262.]

5. BANKS AND BANKING ⊚⇒287—LIABILITY TO DEPOSITOR—LACHES OF DEPOSITOR.

Where a depositor in a national bank received and receipted for a statement from the bank, with accompanying vouchers which showed that the bank, with whose president the depositor was closely associated in many business transactions, had without authority diverted funds from his account to another account under circumstances which practically amounted to theft by the president, but the depositor made no complaint to any one except to the president and the cashier, who was under the president's control, and to them he merely stated that he desired to have his affairs with the bank, including that item, straightened out, the depositor cannot, after the bank has become insolvent through the acts of its president, enforce a claim for that amount against the receiver.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 1089–1104, 1126, 1127; Dec. Dig. ⊚⇒287.]

6. BANKS AND BANKING ⊚⇒287—LIABILITY TO DEPOSITORS—MISAPPLICATION OF CHECK.

Where a depositor had a bank discount his note with the understanding that he would pay the money out of the proceeds of some stock in a few days, but on the same day learned that the stock would not be available and gave to the president of the bank a check for the amount of the note, which the president diverted to his own use, and the amount of the check was debited against the depositor's account, but he was not credited with the amount of the note, a statement of the account from the bank would not necessarily put him on notice that the money had been diverted, and he could therefore either recover from the receiver of the bank the possession of the note or be decreed a creditor for the amount of the check.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 1089–1104, 1126, 1127; Dec. Dig. ⊚⇒287.]

In Equity. Suit by Edmund K. Stallo against Petro W. Wagner, as receiver of the Mt. Vernon National Bank. Decree rendered for complainant for a portion of the amount demanded.

Rockwood & Haldane and Nash Rockwood, all of New York City, for complainant.

Stuart G. Gibboney, of New York City, for defendant.

ROSE, District Judge. On March 11, 1911, the Mt. Vernon National Bank was closed by order of the Comptroller of Currency. He

subsequently put it in the hands of a receiver. It is insolvent. The complainant was a depositor in the bank, and at times a borrower from it. He made his first deposit on the 2d of October, 1909, and his last on the 7th of January, 1911, at which latter date his balance, according to the books of the bank and his passbook had been reduced to $36.69. There were no further transactions between them. Between October 2, 1909, and January 18, 1911, his passbook was balanced *eight* times. On at least six of these occasions he (or his authorized agent for the purpose) signed and returned to the bank one of its regular blanks acknowledging the delivery to him of a specified number of vouchers and his passbook, showing a named balance. Each of these receipts also stated:

"Unless notified to the contrary within ten days, balance as shown will be considered correct, and the vouchers genuine."

On November 3, 1910, a full statement of his transactions with the bank after the last of the receipts and down to the 1st of that month was at the request of his agent furnished him. In his complaint in this case, he says that in arriving at the balance appearing upon the bank's books and his passbook, he was charged with sums that were not proper debits against him, and that the bank failed to credit him with moneys deposited by him with it, and if the account were properly stated between them the bank would owe him $74,-788.11 more. He brings this proceeding to establish his right to such additional amount. With a like object, he instituted a suit against the receiver in the Supreme Court of the State of New York. That case was removed to this court. Judge Mayer held that by the passbook and the receipts signed by him an account had been stated between him and the bank. He did not, on the ground of fraud and mistake, seek to surcharge and falsify such account. The case was therefore dismissed, without prejudice, however, to the complainant's right to bring a new suit, in which such charges of fraud and mistake should be distinctly made. The present proceeding followed.

The complainant knew little of the bank, and probably cared less. It does not appear that he was ever in it in the course of his life. He saw it only once, and that from the outside. He remembers that on one occasion on a Sunday he made a social visit to Mt. Vernon; otherwise, he does not recall ever having been in the place before or since. Before the failure of the bank he never sent any of his employés there. He made his deposits, sometimes by mailing them to the bank, and sometimes by handing them in New York to its president or cashier. When he became a depositor in the bank, one Jennings was its president. He now naturally enough seeks to persuade himself that the bank is responsible to him for what Jennings did to his hurt. He must have been in this frame of mind when he testified that he did not know Jennings until he became a depositor in the bank, thereby suggesting that the acquaintance between them was the result, and not the cause, of his relations to the bank. Beyond all question the reverse was the case. No other reason than his friendship with Jennings has been suggested to explain why he should have become a customer in a bank with which he had otherwise no con-

nections, and which was located in a place which neither himself nor his employés could conveniently visit.

It appears that his account with the bank was opened out of the proceeds of a note discounted by the bank on October 2, 1909, for one Mayhen for $3,000, three-fourths of which was put to Mayhen's credit, and one-fourth of which was put to the credit of Stallo. Stallo had two days before, on September 30th, in anticipation of this discount and deposit, drawn a check for $750 to the order of Mayhen, which was paid by the bank. Just why the transaction should have taken this peculiar and complicated turn does not appear. But it is certain that Stallo must have consulted Jennings about it before it was put through. Moreover, the evidence leaves no doubt that Stallo had previously to that time become interested in some of the large ventures in which, as will be afterwards shown, he and Jennings were both concerned, and into which he says Jennings induced him to go. It is rather significant of the untrustworthiness of his memory that he should have made the statement he did with reference to the date of his acquaintance with Jennings, and also that he should absolutely have forgotten, as he testified he has, all of the circumstances connected with this first deposit and this first of his checks upon the bank, unusual, peculiar, and apparently unnecessary as they appear to have been.

At and before the time he became a depositor in the bank, Jennings and he were warm friends, and they remained so at least until the latter part of 1910. They were intimate business associates in a number of matters of quite considerable pecuniary importance. Jennings, for legitimate and it may be for illegitimate purposes as well, wished him to be a depositor in the bank. Stallo was at about that time a considerable borrower, and he was therefore quite willing to open an account at a bank, which, however inconveniently located in relation to his residence and place of business, had a president whom he had reason to believe would look favorably upon such loans as he might solicit.

Jennings held more than one-third of the stock of the bank. He had for practical purposes absolute control of it. Much of the stock not standing in his own name belonged to persons who had confidence in him, or who sustained such relations to him that they were ready to do with reference to the bank whatever he wished done. The cashier appears to have been under his domination. He was a lawyer, and a man of strong and masterful will. In his financial schemes he was bold and venturesome. He became interested in various projects which demanded for their successful conduct resources much larger than he could legitimately command. He had the opportunity to use the bank's money. The temptation to ward off the failure of his enterprises by using the bank's funds proved too strong for him. When the crash came, as under such circumstances it usually does come, his dishonesty became manifest.

Stallo is also a member of the bar. How great his financial resources were does not appear. They were at all events in his judgment sufficient to justify him in participating on a considerable scale with Jennings in some of the latter's largest ventures. His fa-

ther-in-law, who died in the spring of 1910, was a wealthy man, and Stallo seems to have held during the latter months of his life.a rather broad power of attorney from him, and after his death administered upon his estate. This father-in-law (one McDonald by name), through Stallo, also became interested in some of Jenning's schemes. Stallo was not systematic nor businesslike. He was prone to act in informal, if not in absolutely irregular, ways. He had become so involved in some of his ventures that at times it was not easy for him to come by ready money. No one who listened to the two men testify and familiarized himself with the general story of their relations to each other, to the bank, and to the schemes in which they were jointly interested, will be surprised to find that the accounts between them as individuals and with the bank are hopelessly entangled.

The transactions of which Stallo in this suit complains vary in their details. Generally speaking, they may be divided into two classes:

(1) Cases in which checks or drafts drawn by Stallo upon the bank or upon other institutions and deposited with it for collection were not put to his credit on its books. In every one of such cases Jennings says that Stallo sent these checks and drafts to the bank, not for deposit in it, but to be applied in other ways, and that his directions were obeyed. When Stallo was examined as a witness in this case, he admitted that some of the checks and drafts for which he brought this suit were given by him for the accommodation of Jennings. He persists in his denial that he ever authorized Jennings to make any use of the others.

(2) In a number of cases money to his credit in the bank was without written authority from him applied directly or indirectly to Jennings' use, or to the use of concerns in which Jennings was interested. Stallo testifies that he gave verbal permission for one of the transfers which in his complaint he swore was unjustified. The amount involved in this transaction was only $1,100. He denies that he ever authorized any others. Jennings says he sanctioned all of them. Raymond testified that Stallo told Jennings in his presence to make such transfers whenever they were needed by the enterprises in which he (Stallo) was jointly interested with Jennings. Some of the transfers were, however, unquestionably made for purposes in which he was not concerned. The $1,100 admittedly authorized was of this class.

It will be well to state briefly the facts with reference to the various items of his claims against the receiver. He numbers these claims from 1 to 10; but, as 5 of them are grouped together as claim 4, there are 14 of them in all. Two of these, namely, claim 3 for $2,000 and the $1,100 item or subclaim of claim 4, he now admits were properly charged to his account, thus reducing his claim to $71,788.11. It will be, nevertheless, worth while to state the facts as to these two withdrawn claims, because they throw light upon the way in which to his knowledge and with his consent Jennings dealt with his account.

Claim 3 relates to $2,000 of the proceeds of a note of one Barnsdale for $5,000, which Stallo had the bank discount for him. This note was not paid at maturity, and its face was, of course, properly charged to Stallo. When it was discounted, however, he received credit for only $3,000 of the proceeds, and the other $2,000 was credited to Jen-

nings. In his complaint, to which he swore on the 30th day of March of this year. he said, in effect, that he did not authorize the bank to apply this $2,000 to the use of Jennings. He now very candidly admits that he was mistaken, and that he did tell Jennings to make such transfer.

The first subclaim of his claim 4 was for $1,100, which on the 13th day of December, 1909, was transferred by the bank from the credit of his account to that of Jennings. This charge he also in his sworn complaint says that he did not authorize. He now frankly says that he did telephone instructions to the bank to credit such sum to Jennings.

It is to be borne in mind that he and Jennings were deeply interested, if not involved, in various transactions which in the end proved to be very much larger than their financial resources. Jennings procured for him accommodations from the bank, and did many other things for him. Stallo never went to the bank at all, and did his business with it through Jennings in New York. Neither Jennings nor Stallo cared anything whatever about the form of any transaction, and were at any special time principally interested in accomplishing the particular object they had in view. It is therefore not surprising that it is always difficult, and oftentimes impossible, to tell when Jennings was acting as agent for the bank, as agent for Stallo, or solely for his own hand.

The claims in which Stallo still persists should be considered somewhat in detail, grouping them, however, with reference to the similarity of their facts, or of the legal principles applicable to such facts, rather than in the order in which they appear in the schedule attached to the bill of complaint.

[1] Claim 1 is for the sum of $12,500. In his bill Stallo alleges this was the proceeds of three checks, which were not placed to his credit. The history of the transaction through which the checks or their proceeds are traced by the accountants is quite involved. In his sworn complaint, Stallo puts the emphasis of his charge against the bank at a different place than that indicated by his testimony when examined as a witness. The expert accountants on the two sides agreed that, however complicated these transactions were, there was only one $12,500 not credited to him which ought upon any theory have gone to him. He distinctly and repeatedly testifies that he did, in connection with these transactions, give and intend to give a draft for $12,500 for the accommodation of Jennings; that is, he drew a draft for $12,500, not for his own use, but for that of Jennings. Its proceeds were applied to such use. The only claim that he can have is against Jennings.

Claim 8 alleges the failure of the bank to credit him with the proceeds of a note drawn by him to the order of one Gardner for $12,500. Stallo, however, testifies that this note was also for the accommodation of either Jennings or Gardner. Gardner received, not from the bank, but from Jennings, 15 bonds of the White Plains Development Company to protect him from loss in the transaction. When Gardner, in some of the subsequent renewals of the note, dropped out as indorser, and one Mallory took his place, the bonds came into Stallo's possession. He now, it is true, claims that at the time he supposed he was simply continuing the accommodation which he had

first given Jennings in the Gardner draft mentioned in the course of discussion of claim 1. When the events were much more recent in point of time, he testified at the criminal trial of Jennings that the note now under consideration was given for Jennings' accommodation. He did not then connect it with the earlier transaction. In any event, it is not easy to discern how the bank could be liable for the proceeds of a note given under such circumstances. I am satisfied that Stallo in these transactions was knowingly raising money for the benefit of Jennings, and the money was not put to his (Stallo's) credit, because in point of fact, if it had been so put, he would not have accomplished the purpose for which he gave the note, namely, to aid Jennings.

[2] Claim 2 is for the sum of $1,000. On December 14, 1909, the bank charged to his account $1,000 "for our New York draft to the order of Manhattan Securities Company." The Manhattan Securities Company was a concern in which Jennings and Stallo were both largely interested. Stallo at that time was a member of the executive committee of its board of directors. He had already made it large advances. This $1,000 was duly carried to his credit on its books. The transaction took place in December, 1909, and on March 3, 1910, a debit slip showing the charge and that it was for the money paid the Manhattan Securities Company was included in the vouchers delivered to him.

Claim 4 is a composite claim for the excess of the aggregate of five different items of what he says were unauthorized debits to his account over the total of four items of credit about which he claimed to know nothing. The five items of debit were all made between the 11th and 24th of December, 1909. One of them, for $1,100, on the 13th of December, 1909, he now admits was by his direction given over the telephone transferred to Jennings. Three others, $800 on the 14th, $8,000 on the 15th, and $390 on the 24th, of the same month, were also transferred from his account to that of Jennings. He testified he never authorized any of them, or knew anything about them, or any of them. The fifth is an item of $1,500, which on December 11, 1909, was charged to him for New York draft for Edward H. Kear. Kear, it seems, was an official of Westchester county whose business it was to collect the tax on a large mortgage which Jennings was having recorded for a corporation in which he was interested, and in which Stallo was not. Stallo says that he knew nothing of the transaction, and never authorized it. Jennings testified that Stallo gave him authority to make all these transfers. His recollection as to the circumstances under which the alleged authority was given, or when it was given, is very vague. I am not prepared to affirm that either he or Stallo are consciously trying to say anything that they do not now think to be true; but I do not believe the testimony of either of them can be relied on, except where it is corroborated by other circumstances or by the testimony of persons with more accurate memories.

The fact that these particular sums of money, as well as the $1,000 transferred to the credit of the Manhattan Securities Company, had been so transferred, was distinctly stated on certain debit slips which accompanied Stallo's bank book when returned to his office on the 3d

of March, 1910. In the early part of his testimony he sought to give the impression that he had given these debit slips and bank balances a very cursory and careless examination. Later, however, he produced a scrapbook in which he had pasted a statement made up, as he says, not later than the 1st of June, 1910. It is very possible the statement was prepared on or about May 22d of that year. This statement shows that at that time these items of charge had had careful examination and that he knew as much about them as he knows now. This statement is headed, "H. T. Jennings and Mt. Vernon National Bank in Account with Edmund K. Stallo." In it are found items, such as commissions, etc., which were certainly not charges against the bank. The $1,100 which he now says he had authorized to be transferred to Jennings appears in it in precisely the same way as he included the $1,000 of claim 3, and the $800, the $8,000, the $390, and the $1,500 of subclaims 2, 3, 4, and 5 of claim 4. Upon them he charged interest just precisely as he charged interest on the $1,100. He did not include one of the larger items of $12,500, about which he had addressed a letter to the bank, and apparently rested satisfied with its reply. He says that he had this memorandum before him when he saw Jennings and Raymond, and he told them he wanted them to go over the account between himself and the bank. He does not claim that he mentioned particular items to them, and says that no convenient time could ever be made by Jennings or Raymond to take the matter up with him.

If, as he now claims, Jennings took these sums without his authority, he knew that fact as well then as he does to-day, or rather, as events were at that time much more recent, he then had a more certain knowledge of the lack of authority than it is possible for him now to have. All else he knew at that time precisely as he does now. So far as these items are concerned, he has learned nothing since. If his present testimony is to be believed, he was then aware that Jennings had at one time taken $8,000 of his money without his authority. If that was so, then somebody else than Jennings was the person to be notified. Such a charge was and is a charge of downright theft; yet, knowing that Jennings had taken the money, he made no complaint to anybody but Jennings. He said nothing to Raymond, except to state that he would like his assistance in going over his accounts. He remained on the most intimate and personal business relations with Jennings for many months afterwards, and he knew that his agent had signed, and he subsequently himself signed, statements acknowledging that he had received the balanced bank book and the vouchers, and that he would make a complaint within 10 days if he thought any of them were not proper charges against his account. He then elected to treat the transfers which he now says were unauthorized precisely as he treated those which he admits he had expressly sanctioned. It is impossible to believe that he then regarded those charges as unauthorized, in the sense that he did not accept Jennings as his debtor for them, instead of the bank.

It follows, from what has thus far been said, that claim 1 for $12,500, claim 8 for the like amount, and claim 2 for $1,000 and the $6,150 of the aggregate of the excess of the second, third, fourth, and fifth

subclaims of claim 4 over certain credits which Stallo says he does not know why he received, or a total of $32,150, must be rejected on the facts. No doubtful questions of law are raised by them. It is significant of the untrustworthiness of Stallo's memory in these matters that among these credits about which he claims now to know nothing is the initial deposit of $750 with which his account was opened, and against which, as already mentioned he had drawn a check before it was actually received by the bank.

[3] In the view I take claim 7 must follow the same course. It is for $9,500, the estimated value of 10 bonds of the New Orleans, Mobile & Chicago Railroad Company. Jennings gave Stallo a receipt on the 7th of May, 1910, for a note of one Scandrett for $25,000 and for 36 of such bonds as security therefor. The receipt was signed by Jennings in his individual capacity. There was no mention of the bank in it, except that the note was there payable. Stallo says at the same time he handed Jennings a letter addressed to the bank in which he directed it to use the proceeds of the note in purchase of notes of the Gray Construction Company and of one Greenwood, and to hold the notes so purchased for his account and subject to his direction. No such letter has been found in the files of the bank. During the period covering this date, Stallo copied his letters in a letter-press book. This letter was not so copied. Stallo produces a carbon copy of it, which he says was made at the time the letter was written. Jennings denies having ever seen or heard of such letter. I am not prepared to find that it was ever delivered to Jennings or to the bank, and I am rather of the impression that it was not. Very possibly it may have been prepared, but for some reason Stallo changed his mind and did not send it. So far, however, as concerns his claim for these 10 bonds, the impression produced upon my mind by all the testimony concerning them was that they were in point of fact returned to Stallo, and were apparently by him or his agent subsequently sold. At all events, there is not sufficient evidence in this case in my judgment to charge the bank with these bonds or their value.

[4] Claim 9 is for $8,139.23. According to Stallo's account, Jennings told him it was necessary to take up 4 notes, being claims against the Gray Construction Company, to the aggregate amount of $16,250. Stallo was a subscriber for a large amount of the bonds of the Broadway & Forty-Third Street Company, a building belonging to which was being erected by the Gray Construction Company. He had not paid his subscription to the bonds, but the bonds themselves had been pledged with the Gray Construction Company as collateral. Jennings told him that bonds to the amount of $16,250 had been sold, and that the proceeds should be applied to the payment of certain claims against the Gray Construction Company which it was important to take up. The statement that the bonds had been sold seems to have been true, and Stallo's account was on that day credited with such sum. He drew four checks, aggregating $16,250, each of them being drawn to the order of the bank, and gave them to Jennings with which to take up the Gray Construction Company's obligations. Two of these checks were so used. One of them, for $1,000, was not, but was applied by Jennings to his own purposes. The other, for $7,139.23, was put to the

credit of the McDonald estate, of which Stallo was the administrator. This transaction took place on the 5th day of January, 1911.

His counsel brings out the fact that on the 13th of the preceding July Stallo had drawn a check as administrator on that account for $23,129.23. It seems that for reasons satisfactory to itself the surety on his administration bond had required that all checks on that account should be countersigned. The check in question had not been countersigned. Nevertheless Jennings, under color of the check, used its amount for other purposes. The check itself, however, was not otherwise carried in the bank's work. The McDonald account, the check not being regularly charged against it, was thus short $23,-129.23. What knowledge Stallo has as to these proceedings, or what part he took in them, it is now impossible to say. He says he had none. He testifies that Jennings undertook to get the necessary countersignature. It is illustrative of the loose way in which he did business that this administrator's check was drawn out of his personal checkbook. There is another circumstance which may or may not have in this connection some significance. On the same July 13th upon which he drew the administrator's check for $7,152.10, he gave Jennings a check, which is marked in his checkbook, "for exchange checks." It will be noticed that this sum is very close to the $7,139.23 of the check of January 6th which Stallo says was misapplied. The two amounts may have no connection, but they help to show how difficult it is to make even a plausible guess as to what was the full and real history of the transactions between these two men.

So far as this claim is concerned, it is unnecessary to try to get at the bottom of their dealings with the administration account and between themselves. In any event, Stallo made Jennings his agent to deposit $16,250, and gave him checks to take that money out of the bank and use it for purposes which were not purposes of the bank. If Jennings abused the authority thus given him, it would not appear that the bank became liable, although it be assumed that by crediting the money to persons to whom Jennings had made the bank a debtor the bank's indebtedness was thereby reduced. Stallo gave no instructions to the bank as to how the money was to be applied. The case is indistinguishable from that of Hilliard v. Lyons, 180 Fed. 685, 103 C. C. A. 651 (C. C. A. 3d Cir.). The claim of Stallo based upon it must therefore be rejected.

Claim 10 is for $6,000. On the 29th day of July, 1910, Stallo gave the bank a check for $6,000, drawn to its order upon the Commercial Bank & Trust Company of Laurel, Miss. The check was not paid by the latter bank. When it was returned to the Mt. Vernon Bank, the latter properly enough charged it to his account; but in the first instance it was not credited to him as he claims it should have been. The only question, of course, is whether this check was given to the bank to be put to his account, or was intended by him for some other purpose. In point of fact it was applied to the purchase of or payment for a draft for $6,000 upon the National Reserve Bank. What was subsequently done with the money he says he does not know. His account of why he gave the check is a confused one. He says it was

not to be credited to his bank account, at least not in the ordinary way. It was to be "carried as a cash item" until an outstanding note of his then held somewhere (he does not know where) should be renewed. He understood that it had been discounted at some other bank. Jennings was to have that note taken up and renewed, if possible. There might be some delay in getting this done. According to Stallo's present idea, the check was given to pay the note, if the holder of it did not renew it. This statement, if it is to be accepted as to its face value, seems to bring this claim also under the ruling of Hilliard v. Lyons, supra.

. Claim 6 is for $5,898.88. .It is connected with the remaining 26 of the 36 bonds already mentioned in discussing claim 7. On the 21st day of May, 1910, the bank placed to the credit of Stallo on its books the sum of $16,900, the purchase price by it from him of 26 of the bonds at 65. Stallo says that this sale was not authorized by him. It was, however, entered on his passbook, and there appeared when, on the 5th day of July, he personally signed a receipt for the bank book and the vouchers accompanying it. I cannot hold that such sale. was in fact improper. Stallo alleges now that the market price of those bonds at that time was considerably above 65, and he himself so testifies. His recollection in matters of this kind cannot be trusted. If there was a free market for the bonds at that time, it would have been easy to establish that fact by satisfactory evidence. The direct claim, however, is for $5,898.88, a part of the admitted proceeds of the bonds.

[5] The books of the bank show that this sum was transferred on the 21st day of May from the credit of Stallo's account to that of the First National Bank of Oneonta. Stallo now says that he had no relations with that bank, and that such transfer was totally unauthorized, yet it is admitted that on the 5th day of July, 1910, Stallo personally received and receipted for his bank book and the vouchers covering the period between March 3d and June 30th. Among the vouchers so returned to him was one which on its face said: "Debit Edmund K. Stallo a/c cr. 1st Nat. Bk. Oneonta $5,898.88 paid 5/21 1910." It does not appear that he in any wise at any time before the closing of the bank challenged the propriety of this charge. He includes it among the items which he says he wanted straightened out, and of which he spoke generally to Jennings and Raymond. A good deal more than this was required of him, in view of his relations to Jennings. If he knew that Jennings was taking his money without his authority, he knew Jennings was in effect stealing it. With such knowledge he could not sit by without doing anything to notify the other persons connected with the bank of the criminal conduct of Jennings and Raymond. He may have disliked these charges to his account, but he was not prepared to dispute them to the extent of risking a rupture with Jennings. His relations with the latter were far too close and intimate after this date to suppose that he intended to charge Jennings with what was in fact a theft, and yet as early as the 5th of July, 1910, he knew everything about this charge that he knows now.

It is impossible, because of the unreliability of the testimony of either Jennings or Stallo, to determine precisely what all the facts were. Stallo has not shown any sufficient reason to have the court do for him now what he, with his eyes open, for many months after he was aware of all the facts, declined to do for himself. If he is to be believed, he knew as early as March 3d that Jennings was a thief (or at least was stealing), and so far as the record discloses he was the only person in the world, except Jennings, who did then know it. Had he acted upon the knowledge which he now admits he then had, the stockholders and creditors of the bank might, and probably would, to-day be in a very much better position than they are. He may not now dispute the correctness of a charge which he allowed to stand unquestioned so long. Morgan v. U. S. Mortgage & Trust Co., 208 N. Y. 218, 101 N. E. 871, Ann. Cas. 1914D, 462.

[6] All his claims, except his No. 5 for $10,000, have thus been eliminated. It is in evidence that on the 3d of May, 1910, he offered to the bank for discount his note for $10,000, payable on demand. On the same day he drew to the order of the bank a check for $10,000. The check was never placed to his credit. The proceeds of the note were. The note was not paid at maturity, and was renewed by Stallo. It still remains as a claim against him in the hands of the purchaser of the assets of the bank. Stallo's story is that he wanted to borrow $10,000 from the bank with which to pay $10,000 of his subscription to the bonds of the Gray Construction Company, one of the large enterprises in which he and Jennings were interested. He asked Jennings to have the bank loan him the money, and told Jennings that in a few days one Holloway, who was also interested in some of the enterprises of Stallo and Jennings, and who was president of a bank in the South, would release to Stallo some 150 shares of the stock of the Gulf Investment Company apparently belonging to Stallo, and as soon as he got this stock he would be able to pay the loan to the Mt. Vernon National Bank. Jennings thereupon agreed to make the loan, and Stallo gave the note in question. A short time afterward, on the same day, Stallo learned from Holloway that his directors were not ready to release the stock. Stallo thereupon drew the check to take up the note which he had just given, because he understood that Jennings would not consent to lend the money unless the note was certain to be repaid in a few days.

The check was, in point of fact, used in paying $2,500 each on account of notes of Moran, Robinson, Holloway, and Jennings given for the purchase price of the stock of the First National Bank of Oneonta in the purchase of which Stallo's father-in-law (McDonald), through Stallo, had become a party. If his account of this transaction is correct, his bank book would not necessarily have put him upon notice. The only laches with which he could be charged was in failing to demand the return of the note from Jennings. Jennings says that the check was given by Stallo for the purpose to which it was applied. Taking everything in consideration, I reach the conclusion that this was an occasion upon which Jennings used Stallo's money without Stallo's previous authority. There is not sufficient evidence

that the latter, by accepting entries in his passbook or otherwise, ratified what had in the first instance been unlawfully done.

It follows that the bank or receiver must account to him for $10,-000. If the receiver still holds the Stallo note for $10,000, the simplest decree would be to require its surrender to him. Under all the circumstances, the receiver should, if he wishes, still have a chance so to do, if he can. The decree should provide that his bill shall be dismissed if within 30 days the note is returned to Stallo, or if within such time to protect him against liability on it, there is delivered to him a bond in the amount of $15,000, executed by some corporate surety whose underwritings for such amount are under the general rules and practices of this court accepted. If neither of these things are done, he should be decreed a creditor of the bank for the sum of $10,000, with interest from the 3d day of May, 1910, until such day as in the winding up of the bank interest has been calculated upon the claims of its other creditors, and until such further date as interest may at any time be paid out of the assets of the bank to its general creditors.

Each party should pay his own costs.